### SCHAEFER et al. v. FLEMING, Temporary Controls Adm'r.
### No. 367.

United States Emergency Court of Appeals.

Heard at Los Angeles, Cal., Dec. 30, 1946.

Decided March 27, 1947.

Abraham Gottfried, of Los Angeles, Cal., for complainant.

Samuel M. Singer, Attorney, of Washington, D. C. (Carl A. Auerbach, General Counsel, William R. Ming, Jr., Chief, Court Review Price Branch, James A. Durham, and Josephine H. Klein, Attorneys, all of Washington, D. C., all of the Office of Price Administration, on the brief), for respondent.

Before MARIS, Chief Judge, and McALLISTER and LINDLEY, Judges.

McALLISTER, Judge.

Some time back in 1943, complainants became engaged in the enterprise of procuring the manufacture of bamboo rakes in Mexico, for sale in the United States. During that year, they carried on considerable informal negotiations with the Office of Price Administration, proposing and seeking the establishment of maximum selling prices for such rakes; but no price was fixed as a result of their activities, because certain detailed statements required by the Price Administrator had not yet been submitted.

Complainants came within the category of importers of goods from foreign countries for sale within the United States. Since they had not established a maximum price under the General Maximum Price Regulation, they were required, by Section 8(e) of the Maximum Import Price Regulation* to apply to the Export-Import Price Branch of the Office of Price Administration for approval of proposed maximum selling prices. The Maximum Import Price Regulation adopted as a basis for the establishment of maximum prices, the "landed costs," which existed at a certain base date, and added thereto certain margins also determined with reference to a base date. But the foregoing is not pertinent to this case. However, new items which had not previously been imported, —and this is the provision with which we are here concerned—were to be priced at levels in line with those priced under the general formula. The Regulation sought to provide a basis, fair and equitable to importers as a group; new items were to be given prices within this general framework; and importers had to conform to the price levels thus established. This, it may be observed, is similar to the theory, under which many other maximum price regulations have been promulgated by the Administrator.

Accordingly, on May 5, 1944, complainants filed a formal application in compliance with the Maximum Import Price Regulation requesting the establishment of a maximum price on bamboo rakes imported from Mexico. In their application, they sought a price of $1.29 per rake, with discounts from 33⅓% to 50%. They also sent a sample rake on to Washington for examination by the Export-Import Price Branch.

On July 3, 1944, complainants received a letter from Charles J. Walsh, Price Executive of the Export-Import Branch of the Office of Price Administration, at Washington, advising them that they could sell such bamboo rakes to wholesalers at a maximum price of 40 cents each, f.o.b. Los Angeles, and to retailers, at a maximum price of 50 cents each, f.o.b. Los Angeles. They were advised that these prices were in line with the prices approved for other importers of bamboo rakes.

Shortly after receiving this letter, complainants, on July 7, 1944, wrote Walsh, the price executive, protesting that such prices were too low, and stating that it appeared that he had either failed to consider the costs as outlined in their letter of application, or that the information from other sources, on which the decision was based, was erroneous. They also mentioned that because of action by the United States Custom Department, complainants had been required to increase their entry prices, subsequent to the time of their application, and that, further, they had ascertained that 40% of the rakes received in shipments were defective, instead of 10%, as they had estimated when they first made application for maximum prices. Nearly a month passed with no answer to this letter, and complainants then wired on August 1, 1944, to Walsh requesting a reply.

On August 4, 1944, Walsh wired complainants that the maximum prices for complainants' rakes had been revised, and that they had been increased from 40 and 50 cents

---

*8 F.R. 11681.

each for sales to wholesalers and retailers, respectively, to 44 and 55 cents. A letter from Walsh of the same date informed complainants that, "in the light of the additional information contained" in complainants' letter of July 7, 1944, the price established on July 3, 1944, had been reviewed and reconsidered, and that the Export-Import Branch "grant you permission to sell this imported Mexican bamboo rake, per sample submitted, to wholesalers at a price not in excess of 44 cents each, f.o.b. Los Angeles, and to retailers, at a price of not in excess of 55 cents each, f.o.b. Los Angeles. These prices supersede the prices approved for you in our letter of July 3, 1944. Based on the quality of the sample submitted by you, these are the maximum prices that can be permitted, considering the prices approved by this office for all other importers of Mexican bamboo rakes."

On August 7, 1944, complainants again protested against the revised maximum prices as being too low, and pointed out that the rakes which they were importing were "definitely superior and an improved version of bamboo rakes."

On August 11, 1944, Walsh wired stating that "if rake you are now importing is superior to sample submitted, please send another sample."

On September 5, 1944, complainants advised the Export-Import Branch that a sample had been sent the same date by express, and called to the attention of Walsh that they had been informed that a wholesale price of 64 cents had been granted to Pacific Bamboo Products, of Los Angeles, for a Mexican bamboo rake of inferior quality.

Complainants subsequently asked for a decision on several occasions, finally dispatching a telegram on June 25, 1945, asking a ruling, or advice on when a ruling on their request for further reconsideration might be expected.

On July 4, 1945, eleven months after the Export-Import Branch had requested a second sample rake, which was supplied by complainants, they received a telegram from Walsh, on behalf of the Branch, stating that he regretted that he could not recommend increasing prices over 44 cents each to wholesalers, and 55 cents each to retailers, f.o.b. Los Angeles, on the basis of the information submitted.

On July 31, 1945, complainants filed a protest under Section 203(a) of the Emergency Price Control Act of 1942, as amended, 50 U.S.C.A. Appendix, § 923(a), claiming that the maximum prices established for the rake which they imported, were not determined in accordance with law, but that they were established arbitrarily and capriciously.

Immediately after complainants filed their protest, and on the same day, the Price Administrator filed a suit against complainants for treble damages on the ground that they had violated the order establishing maximum prices.

Complainants' protest was considered by a Board of Review which recommended denial of the protest on the ground that the maximum prices fixed by the Export-Import Branch were properly determined, and that the protested order was not arbitrary, capricious, or otherwise invalid. The Administrator adopted the recommendations of the Board of Review, and entered an order denying the protest; and the present complaint was thereafter filed in this court.

■ Many contentions are advanced involving various aspects of the case, but upon a review of the record, we have come to the conclusion that the decisive issue is whether the Administrator's determination —that the maximum prices which had been fixed for complainants' rake were in line with those of other importers—was supported by substantial evidence. We concur in the statement made in the brief of counsel for the Administrator, in which they say that "the only substantive question before the court is whether there was sufficient evidence for the Administrator's factual conclusion that complainants' revised prices were in line with those of other importers." For if there is not substantial evidence to support such conclusion, the order establishing such maximum prices is arbitrary and capricious, and must be set aside.

The evidence in the case consists of numerous affidavits submitted by both parties to the controversy. It also appears that several types of bamboo rakes were in evidence and referred to in the affidavits.

The Administrator introduced in evidence only one affidavit and, upon it, placed his sole reliance to sustain his conclusion. This was the affidavit of Theodore Ashmore, Associate Economist and Business Analyst of the Export-Import Branch of the Office of Price Administration, from the time complainants made their first application for maximum prices up to the date of the filing of their protest.

In this affidavit, Ashmore sets forth that, from 1937 to 1943, he had been in the general import business, and during that time, had imported bamboo, bamboo rakes, rugs, mats, and fibres "from Japan, India, Dutch East Indies, etc.," and that he was familiar with the importing and merchandising of bamboo rakes and with the relative price lines in which such articles were sold at wholesale and retail, prior to price control. He stated that before the war, the only country exporting bamboo rakes in any significant quantity, was Japan. Apparently, he had never imported anything from Mexico.

Ashmore then recounted how complainants had applied for the establishment of maximum prices on bamboo rakes imported from Mexico, and that after they had submitted one of the rakes as a sample, he had recommended a maximum price of 40 cents each to wholesalers, and 50 cents each to retailers, and that these maximum prices were established by order dated July 3, 1944; that thereafter, on July 7, 1944, complainants had objected to these prices, and that sometime, on or before August 4, 1944, the Office of Price Administration had received another sample bamboo rake from complainants, and a request for reconsideration of the maximum prices established on July 3, 1944. His sworn statement continues:

"Although the first and second samples were substantially the same, so that they were, in effect, the same rake, I found the second sample to be of a little better quality and construction than the first sample submitted by the Protestant. Therefore, on August 4, 1944, I recommended revising Protestant's ceiling prices from 40¢ each to 44¢ each to wholesalers, and from 50¢ each to 55¢ each to retailers, f.o.b. Los Angeles. These revised prices were based on a comparison of the quality, construction, durability of Protestant's sample with samples submitted when maximum prices were approved for other importers. On August 4, 1944, the Office of Price Administration approved and established the revised maximum prices of 44¢ each to wholesalers and 55¢ each to retailers, f.o.b. Los Angeles, as recommended by me.

* * * * * *

"Attached hereto is a table comparing Protestant's rake with other imported bamboo rakes. This table is based upon my own physical examination of samples of rakes listed.

"On the basis of my examination of Protestant's rake and the other rakes described in the attached table, it is my opinion that the J. C. Rojas rake is much sturdier and more serviceable than Protestant's rake as are those of La Luz Del Dia and American Import Company."

Ashmore further went into the matter of the maximum prices for the Mexican bamboo rakes, imported by Pacific Bamboo Products, of Los Angeles, which complainants had reported to the Export-Import Branch, were of inferior quality, although a much higher maximum price had been allowed for such rakes, than had been authorized for the rakes imported by complainants. In this regard, his affidavit states: "Protestant has referred to maximum prices established for Mexican bamboo rakes imported by Pacific Bamboo Products. On August 29, 1944, maximum prices of 64¢ f.o.b. Los Angeles to retailers and 89¢ to ultimate consumers were approved by the Office of Price Administration for Pacific's bamboo rake. The sample of this rake which was submitted by Pacific Bamboo has been mislaid, so I am unable at this time to compare this rake with Protestant's. However, Pacific Bamboo's maximum prices were established at the level requested by that company on my recommendation, after an examination of the rake. At the time I recommended approval of the maximum prices for the Pacific Bamboo Product's rake, I had available both its sample and Protestant's. The maximum prices approved for Pacific Bamboo products reflected my judgment of the relative value of the two rakes."

Ashmore further mentioned that for another type of bamboo rake imported by complainants (which is not related to this controversy) he had recommended maximum prices of 58 cents to wholesalers, and 72 cents to retailers, and that these prices were later established by the Administrator. This rake, however, while of heavier, sturdier construction, was not designed as a lawn rake, but was suitable for other heavier duties, such as raking gravel in service stations, cleaning out rabbit hutches, and the like. It did not have the flexibility or lightness desirable in a lawn rake. Why it was injected into the controversy does not appear, except to show that Ashmore recommended a higher price for an admittedly heavier and sturdier rake.

In the foregoing evidence, upon which the Administrator solely relies, there is one defect. But it is a fatal defect. It is all based upon one prime, controlling, fallacious statement. This is disclosed in Ashmore's declaration that when he recommended an increase of maximum prices for complainants' rake on August 4, 1944, he did so because of the superior quality and construction of the second sample rake which had been furnished by complainants —that "although the first and second samples were substantially the same, I found the second sample to be of a little better quality and construction than the first sample submitted by the Protestant." And he stated that, therefore, on August 4, 1944, he recommended the higher prices, based on a comparison of the quality, construction, and durability of such sample with samples submitted when maximum prices were approved for other importers.

Now the fact is that, according to the undisputed and documentary evidence in the case, Ashmore did not have the second sample at the time—August 4, 1944—when he recommended the increase of maximum prices. Walsh, the price executive, first requested the second sample on August 11, 1944; and apparently it was not sent from Los Angeles until September 5, 1944. Why, then, did Ashmore recommend an increase of prices on August 4, 1944? Counsel for complainant, we believe, divined the answer in his argument: the increase was granted merely because of the emphatic complaint

—"we were amazed, etc."—that the first price was too low. Certainly, Ashmore did not then have the second sample before him. But did he even have the first sample at that time? It is not clear why Walsh, on behalf of the Export-Import Branch, was asking for a second sample on August 11, 1944. He was writing that "if rake you are now importing is superior to sample submitted, please send another sample." It would seem natural that complainants would have been resourceful enough to have sent on another sample, on their own volition, if they had desired to have a maximum price established for a rake that was of a different and better quality than the first which they had planned to import. It would be a reasonable speculation on the part of one who received such a request, to wonder whether the people down in Washington had lost the first sample. As a matter of fact, in an order issued in the course of the protest proceedings, providing an opportunity to complainants to inspect the samples of rakes used as comparisons in establishing maximum prices for complainants' rake, the Administrator disclosed that he could not make available the first sample rake submitted by complainant "for the reason that it is mislaid"; but the Administrator went on to say that, in any event, the protest was "not concerned with the maximum prices established July 3, 1944, but with those established August 4, 1944, on the basis of the sample described as Exhibit I (complainants' second sample)." Thus the Administrator by formal order assumed that the complainants' maximum prices had been established on the basis of this sample —although the pricing officials had no such sample for several weeks after the order fixing the maximum prices. However, the second sample rake, and the heavy duty rake, submitted by complainants, and the rakes of three other sellers, were made available by the Administrator for inspection.

It may also be of some significance that complainants, in the early part of September, 1944, had been insisting to the Export-Import Branch that a maximum price of 64 cents to wholesalers had been approved for a Mexican bamboo rake, imported by the Pacific Bamboo Products Co., although.

such rake was of inferior quality. The Pacific Bamboo rake was not forwarded for inspection. It too had been mislaid.

In any event, whether Ashmore had complainants' first sample at the time he recommended increased prices, he did not have the second sample for it was not even requested or sent to Washington until long afterward. In spite of his statement, the increased prices could not have been based on the second sample. They were certainly not based on the first sample, because there was no reason to increase prices on that one, except because of mistake or oversight, and that is not claimed by the Administrator.

Nor did Ashmore compare this second sample, as he says, with the rakes of J. C. Rojas, La Luz Del Dia, or the American Import Company, at the time the increased prices were given complainants—because, as has already been pointed out, he did not have the second sample at that time. Ashmore did not make his affidavit until October 23, 1945. Any comparison he made, therefore, between the above mentioned sample rakes was subsequent to the receipt of the second sample sometime in September, 1944, and the before date of execution of his affidavit. Whatever the case, the maximum prices eventually established for complainants were based neither on the first sample nor the second sample, nor upon any evidence that has been, so far, presented to this court.

In view of the findings of the Board of Review, certain evidence introduced on behalf of complainants should here be mentioned. The affidavit of Ashmore was incorporated into the record of the case by the Administrator on November 7, 1945. Within a week thereafter, counsel for complainants entered his appearance, and, with the utmost dispatch and sagacity, asked to have the sample rakes used as comparisons by Ashmore and mentioned in his affidavit, transmitted to the Los Angeles Office of Price Administration for inspection by complainants. He further asked for the address of Ashmore. An order was entered transmitting the samples for inspection, accompanied by a letter, notifying complainants' counsel that Ashmore was no longer with the Office of Price Adminis-

tration, and that they did not know his exact address, but that they understood he was in India.

When the rakes were available for inspection in the Los Angeles office, Claggett Offutt, Import Price Specialist, of the Office of Price Administration, in the Los Angeles Office, was asked by the head of the office having charge of such matters to examine the five sample rakes sent on from Washington and express his opinion as to their quality and serviceability. He did not know who the makers or importers of the rakes were. He selected the heavy duty rake of complainants as best; then, complainants' rake, here in question, as next best. He then ranked the rake called La Luz del Dia, in third place; then the rake of the American Import Company, as fourth; and the Rojas rake in the last place, under the designation, "worst." Ashmore had stated in his affidavit that after a comparison and study of the rakes, all of the other rakes were better than complainant's rake. Offutt, the Import Price Specialist for the Office of Price Administration, in Los Angeles, gave as his opinion that complainants' rake was better than all of the other rakes.

Walter Sage, purchasing agent for a company which had been importing an average of 70,000 bamboo rakes per year, from Japan, China, Formosa, and Mexico, for the previous seventeen years, examined the rakes in the presence of the officials of the Office of Price Administration. There were no distinguishing marks on the rakes. He selected complainants' rake, here in question, as superior to all the rest, because it had the best rake teeth, and because of its width, flexibility, and good workmanship. He stated the Luz del Dia rake was second best, but was not as flexible or well made as complainants'. The American Import rake was, in his opinion, not of as good construction for a lawn rake as complainants'; and it was not sufficiently flexible. He called the Rojas rake the worst of the lot—absolutely inferior to all the other exhibits shown; and that it was too light and poorly made. He considered complainants' heavy duty rake too rigid and heavy for a lawn rake, but good for certain different purposes. He, therefore, ranked com-

plainants' rake as superior to all the others, in contrast to Ashmore who ranked it poorest. The affidavit of Jack Schaefer, one of the complainants, was similar to that of Sage.

With this evidence before it, the Board of Review concluded that Ashmore's judgment of the respective merits of the rakes was to be disregarded. He had stated that the Rojas rake was superior to that of complainants. The Board found that the Rojas rake was inferior to the rake of complainants.

But in arriving at its determination, the Board indulged in some rather strange reasoning. It referred to the maximum prices allowed on the sales of the rakes, and stated that the affidavit of Ashmore indicated that the prices fixed represented his judgment of the respective merits of the four rakes. This was not so, because although the maximum price for the rake, designated as La Luz del Dia, was 40 cents to jobbers, Ashmore stated in his affidavit that this rake was much sturdier and more serviceable than complainants' rake. Omitting this item from our consideration then, the Board found that Ashmore had ranked the Rojas rake as the best with a price of 54 cents to jobbers; the American Import rake as second, with a price of 47.4 cents to jobbers; and complainants' rake, third, with a price of 44 cents to jobbers.

As to the Rojas rake, the Board found that instead of being the best, it was the most inferior rake of all those submitted, and, in this, followed the evidence contained in the opinions of Offutt, Sage, and Schaefer. But the Board declared that, if the Rojas rake is disregarded, the other rakes fall into a consistent pattern. Complainants' rake was Exhibit I; La Luz del Dia, Exhibit III; and the American Import rake, Exhibit IV. The Board further said: "Exhibits I, III, and IV, which are pretty generally alike, fall within a fairly narrow price range, * * *. Comparing Exhibit I with the two most closely comparable items, Exhibits III and IV, the results appear entirely reasonable. Exhibit I falls in the middle of the range, a few cents above Exhibit III, and a few cents below Exhibit IV. The elements of superiority in Exhibit I over Exhibit III have thus been recognized. As to Exhibit IV, while particular features might be debated, there is no doubt that it possesses one great advantage over the others, in that the handle and the fan are 'attached by means of metal plates, bolts and nuts, which is not true of any of the others. This feature alone seems to support a judgment placing Exhibit I a few cents below Exhibit IV."

By its finding that the Rojas rake was the most inferior, the Board destroyed the entire force and weight of all the evidence on which the Administrator relied—the affidavit of Ashmore, who had found that it was the best. When the Board concluded that the elements of the superiority of complainants' rake over the Luz del Dia rake had been recognized by Ashmore in the higher price given complainant, it contradicted the very finding of Ashmore himself, when he stated that on the basis of his examination of the rakes, the Luz del Dia rake was much sturdier and more serviceable than complainants' rake. And when, to support Ashmore's conclusions, the Board, through a subcommittee of one member, found that the fact that the manner of fastening of the handle and the fan of the American Import rake, entitled it to a price a few cents higher than complainants' rake, such a finding was supported by no evidence in the case.

As has been remarked, the subcommittee of the Board of Review consisted of one member. In effect, what this member was doing in the report formulated by him for the Board, was repricing, on his own initiative, the rakes, imported by the various parties— contrary to the expert evidence in the case—in order to sustain the opinion evidence of a pricing official which he was bound to find, and did find, worthless and to be disregarded in all of its principal particulars. This is a misconception of the function and duties of a Board of Review.

The report and recommendations of the Board of Review, upon which the Administrator relied in dismissing complainants' protest, sought by the involved methods, above mentioned, to bolster up a case that kept falling apart at each step of the proceedings.

 It is our conclusion that complainants have shown that the maximum prices fixed for their rake upon Ashmore's recommendation were based neither on the first

sample submitted to the Office of Price Administration, prior to July 3, 1944, nor on the second sample, submitted subsequent to August 11, 1944. Moreover, it appears that the maximum prices fixed for complainants' rake were not in line with those of other importers. Complainants' rake— the second sample— for which the Office of Price Administration claimed it established maximum prices—was not compared to the rakes of other importers at the time its maximum prices were established, for the reason that the price officials did not have possession of the sample for many weeks thereafter. And, if it were necessary to add, the overwhelming weight of the evidence shows that complainants' rake was superior to all those with which comparisons were subsequently made, although in allegedly establishing prices for complainants' rake, and in comparing it with the other rakes, it was rated as inferior to them by the price officials. It follows that the order of the Price Administrator establishing maximum prices for complainants' rake was not based on substantial evidence, but was arbitrary and capricious.

Many interesting and important questions are ably discussed by counsel in their briefs and argument, but our determination makes it unnecessary to consider them.

A judgment will, therefore, be entered declaring invalid ab initio the Administrator's order of August 4, 1944, establishing maximum prices for bamboo rakes imported from Mexico by complainants.